Filed 10/19/22  P. v. Pettit CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BRANDON SCOTT PETTIT,<br><br>    Defendant and Appellant. | F082379<br><br>(Super. Ct. No. 1462584)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Stanislaus County.  Thomas D. Zeff, Judge.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Brandon Scott Pettit's parents were shot to death in their home, which was subsequently intentionally set on fire.  The People's theory was that the crimes were perpetrated by appellant's friend, Felix Valverde, and appellant had hired him to do so.

Valverde was charged with appellant as a codefendant but was subsequently found mentally incompetent to stand trial and was separated from appellant's trial.

Appellant was convicted following a jury trial of two counts of first degree murder (Pen. Code,[1] § 187, subd. (a); counts I & II). The jury found true an allegation that appellant acted intentionally, deliberately and with premeditation and a special circumstance that the murders were intentional and carried out for financial gain (§ 190.2, subd. (a)(1)). The court sentenced appellant to two consecutive terms of life without the possibility of parole.

On appeal, appellant contends the court erred by admitting statements he made to law enforcement he alleges were taken in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). He further contends the court erred by declining to review Valverde's competency report in camera in response to appellant's motion for access to the report under section 1369.5, which was then recently enacted, to determine whether it contained exculpatory information that should be released to appellant. He further contends the court erred by instructing the jury they could find appellant guilty of murder based on the natural and probable consequences doctrine. He also requests we independently review the court's in camera proceedings with regard to appellant's pretrial discovery motion under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*). Finally, he contends the cumulative prejudicial effect of the alleged errors warrant reversal of the judgment. Respondent concedes instructional error but contends it was clearly harmless given the jury's verdict on the premeditation and deliberation and special circumstance allegations. Respondent does not object to appellant's request we review the *Pitchess* proceedings but disagrees with the remainder of appellant's contentions.

---

[1] All further undesignated statutory references are to the Penal Code.

Finding appellant's statements to law enforcement were taken in violation of *Miranda*, and their admission was not harmless, we reverse the judgment and remand for a new trial. Upon remand, should appellant request access to Valverde's competency report under section 1369.5, the court must review the report in camera and make the proper considerations in deciding whether to grant appellant such access. We have reviewed the in camera proceedings regarding appellant's *Pitchess* motion and find no error. Because we reverse the judgment, we need not address appellant's claims of instructional error or cumulative error.

## FACTS

*Prosecution Evidence*

In the early morning of August 8, 2013, the fire department was called to investigate a house fire at the Pettit residence, where David Scott Pettit and Janet Pettit lived with appellant, their adult son.[2] Scott and Janet were found dead inside their bedroom. It was determined Scott had suffered a total of five gunshot wounds and died from gunshot wounds to the head, chin, chest and right elbow. Janet had suffered a total of two gunshot wounds and died from gunshot wounds to the head and left thigh. Both died before the fire was set. The fire investigator opined based on the department's investigation that the fire had been intentionally set by an ignitable liquid. Appellant was not home at the time of the incident because he was out of town at work as a security guard.

Police notified appellant of his parents' deaths that morning. The next day, they conducted an interview with him to gather background information about the family and determine possible motives of anyone who might want to hurt his parents. Appellant gave police contact information for his friends. As for possible theories of what

---

[2] To avoid confusion, we will be referring to David Scott Pettit as Scott, as trial evidence revealed that is what he went by, and Janet Pettit as Janet. No disrespect is intended.

3.

happened to his parents, appellant told the police his ex-girlfriend, Susan Carter,[3] had ties to the Nicaraguan cartel, who could have someone hurt or killed within 24 hours. Appellant also suggested Carter could have snuck in to kill them.

Further investigation revealed that people in appellant's life had heard him make concerning comments in the months leading up to his parent's death, many of whom testified at trial. Scott's friend, Michael Anderson, testified that in the middle of 2012, he gave appellant a job at Scott's request. Scott had a number of cars, some of which he kept at Anderson's property, including a Corvette. Between the middle of 2012 and the middle of 2013, appellant would go to Anderson's house frequently and during that time appellant made comments about his parents, including, at one point, saying he would be better off if his parents "weren't here." Appellant would work on the Corvette and tell Anderson it belonged to him. Appellant also told Anderson he was moving to Georgia. At the Pettits' vigil, appellant wanted to know if the cars were at Anderson's house and expressed interest in selling the Corvette and heading to Georgia.

Carter testified she was in a relationship with appellant in 2013 and lived in a house she rented from Scott. Appellant lived with her for a short time, but after they ended their relationship in July 2013, he moved back in with his parents. In April 2013, she went with appellant and Scott on a road trip. She and appellant rode together in the Corvette and appellant told her he could not wait until the car was his so he could treat it properly. Appellant told Carter that once Scott died, the car would be his. Appellant often showed Carter pictures of multi-million dollar homes in Montana and Missouri he wanted to buy though at the time he did not have a job. Appellant also told Carter he would be coming into a lot of money. On another occasion, appellant told Carter he could "get rid of" her ex-husband for her by paying his friend, Felix Valverde, $500.

---

[3]     Susan Carter, during a period relevant to the facts of this case, went by the last name Sanchez. She is referred to both ways throughout the record; for consistency, we refer to her only as Carter, as that is how she identified herself when she testified at trial.

4.

After Carter and appellant broke up, appellant would text her stating he was irritated about how his parents were treating him like a child and on one occasion he told her that he wished his father was dead. In total, he told Carter he wanted his parents dead about five or six times.

Carter's sister, Corin Cazares, testified that in June 2013, appellant told her and her boyfriend he was going to be coming into a large sum of money in a couple of months and was interested in buying her boyfriend's vehicle.

Appellant's friend, Sarah Wilson, testified appellant told her that his parents had money and would be buying him a million dollar home in Georgia where he wanted her to live with him. He had sent her email correspondence between himself and a realtor in Georgia. Appellant told her that his mother had arranged flights to Georgia so they could look at houses, and they were supposed to leave on August 9, 2013.[4] On August 7, appellant texted Wilson that she was getting a "boob job" for Christmas. On August 8, she found out his parents had died, and she went to his friend's house to see him. Wilson asked appellant if she should cancel the flights, and appellant responded that his aunt would cancel them. After appellant met with the police, he told Wilson he gave them her phone number and he told her not to tell them his aunt had cancelled the flight tickets and not to tell them about the realtor he had been corresponding with in Georgia.

Appellant's friend, Arlin Traster, testified in the summer of 2013, he saw appellant occasionally, and during that time, appellant told Traster he wanted to "off" his parents. Appellant told Traster his parents were being "dicks" and that they had money. Traster did not take him seriously about offing his parents and believed it was just bar talk. Traster denied telling Modesto Police Department Detective Michael Hicks that appellant told him he gave someone $500 as a down payment to kill his parents. Hicks later

---

**4** All further dates are to dates in 2013, unless otherwise indicated.

5.

testified, however, that Traster had told him appellant said he gave someone a down payment to off his parents in the summer of 2013.

Police investigation also revealed evidence indicating Valverde was involved with the murders. Valverde's friend and neighbor, Matthew Wells, testified in mid to late July 2013, Valverde had recently picked up a .22 caliber "old western revolver" with a pearl handle. They went shooting with it on July 27. The revolver shot two types of bullets: .22 long rifle and .22 shorts. Valverde shot the gun from a variety of positions, including from a standing position, taking a knee, and lying on his stomach.

Wells saw Valverde late on August 8, while drinking with other friends and neighbors near their apartments. Valverde was not much of a drinker, but that night he was throwing up, "pouring down sweat," and his glasses were fogged. Wells asked Valverde if there was something wrong, and Valverde said he was sick with kidney stones. Wells saw appellant a few days after the incident visiting Valverde, and when he told him he was sorry for his loss, appellant responded, "It's all good." Wells took appellant's response as appellant did not really know Wells and it was not really his business.

The week following the murders, police conducted a search of Valverde's residence and recovered a box of .22 caliber ammunition from Valverde's kitchen counter and a gas can containing gasoline from the kitchen. Police also recovered from Valverde's hall closet a rolled up paper bag which contained Scott's and Janet's wallets and keys to the Pettits' home. From a planter outside Valverde's apartment, police recovered seven spent .22 caliber casings. Police did not recover a revolver or handgun from the residence. A neighbor testified that about a week or week and a half before he saw the police searching Valverde's residence, he saw Valverde bent over the planter and moving the flowers around.

Hicks testified that after personal items of Scott and Janet were found in Valverde's apartment, he went to where appellant was staying to ask him if he knew why

6.

they were there. Appellant denied knowing how they would be there, and Hicks and appellant arranged to have a second interview later that day. Hicks testified that during appellant's first interview on August 9, appellant never mentioned Valverde as being one of his friends. On or about August 16, Hicks texted appellant asking him who Valverde was, and appellant never directly answered the question though Hicks asked three times.

During Hicks's second interview with appellant on August 17, appellant denied giving Valverde the keys to his parents' house. Appellant reported never having seen the keys because the family used access pads in order to access the doors to the home and his father kept the keys in a safe that appellant did not have access to. Appellant also denied having the pass code.

Hicks asked appellant why he never told him about Valverde, and appellant responded by telling Hicks that Valverde was trying to extort money from his family and that was the reason he did not tell Hicks about him. Appellant told Hicks he was trying to figure it out himself. Appellant explained that Valverde knew appellant's parents had a lot of money because they were doing large renovations to their home. Appellant said Valverde wanted $10,000 in exchange for not hurting his family. This threat occurred approximately a month before Scott and Janet's deaths. Appellant did not tell the police but did tell Scott. According to appellant, Scott did not believe the threat and said he would look into it himself.

Initially during the interview, appellant stated he and Valverde were only acquaintances but later admitted to being friends. Appellant stated that after Valverde's threat, appellant continued their friendship; they continued to have contact and phone calls, and appellant had given Valverde a box of bullets. Appellant told Hicks that he now understood why Valverde wanted them. Appellant admitted to having a phone conversation with Valverde while he was at work on August 7 about what they were going to do on the weekend. Appellant also admitted to going to Valverde's house late in

7.

the evening on or about August 12, after a memorial service for his parents and giving him $100. Appellant said he gave Valverde the money because he needed it for his kids.

Hicks confronted appellant with the comments appellant had made about wishing his parents were dead, and appellant responded that he had a good relationship with his parents and denied any involvement in their deaths. According to Hicks, appellant never asked Hicks how his parents were murdered, and when Hicks questioned appellant on that point, he responded that he did not want to know. Hicks asked appellant how he would come up with $1.3 million to buy a home in Georgia and appellant responded that his parents would help him out.

### Defense Evidence

Appellant's sister, Lauren Pettit,[5] testified on his behalf. She testified appellant would occasionally lie to impress people and bragged about things to make friends. He would often give people money to help them. Lauren testified appellant and his father spent a lot of time together and were best friends. They would work on Scott's collector cars together, and appellant would help Scott at his rental home and his karate school. They would also work on community events together such as a toy drive every year. Lauren knew of no falling out between appellant and her parents, and she never heard him say he wanted them dead. She would not have believed it if she had heard it. Appellant and Scott were both listed as registered owners and lien holders on the pink slip for the Corvette. Lauren never heard appellant talk about his parents buying him a home in Georgia or a ranch in Montana. Lauren stated that appellant does not show grief in the same way as others and was upset when his parents died. Appellant has tattoos on his forearms that say, "Family forever," which he got around 2011 or 2012. Lauren

---

**5** To avoid confusion, we refer to Lauren Pettit by her first name. No disrespect is intended.

believed her parents carried keys to the house with them. After her parents' deaths, Lauren gained access to the home by crawling through the dog door.

Appellant's aunt, Pamela Mills, testified she is a psychologist specializing in child and adolescent assessment for disabilities though she was not testifying as an expert. She has known appellant since he was born, and his parents often asked her for advice about him. She advised them on a situation where appellant was being asked to leave his preschool and attended an IEP meeting with his mother when he was in high school. Appellant had a learning disability, specifically in written language. Appellant did not have friends when he was younger and had poor social skills. Appellant spent "an enormous amount of time" with Scott. Scott told Mills that he bought the Corvette for appellant. Mills never heard of or observed appellant showing aggression. Mills was present when Lauren crawled through the dog door and stated that one of the detectives had said he also entered the house through the dog door.

Clinical psychologist, Laura Geiger, testified she was appointed to assist the defense as an expert. She had not met or treated appellant; she reviewed "extensive documentation" including police reports, transcripts of interviews conducted by the police, school records, and past psychiatric records and psychological assessments in order to provide any information she could "from a clinical psychological perspective that could throw light on the case." She learned that appellant had "a lifelong set of symptoms that coincided with a pervasive developmental disorder, such as Asperger's." She explained appellant had been given various diagnoses over the course of his life, including Attention Deficit Disorder, Asperger's, depression, Obsessive Compulsive Disorder, and learning disabilities. The documents she reviewed included a thorough evaluation which showed he was intelligent and functioned in average categories of thinking skills such as vocabulary and being able to identify a missing component in a picture but had impaired processing speed.

9.

Geiger testified a multi-hour police interrogation would be the type of environment that would be "quite difficult" for a person with Asperger's because they could become "overwhelmed with the verbal interaction, the back and forth, a very ambiguous situation with … not knowing how to respond." Geiger explained that a person with Asperger's will have a tendency to want to be cooperative in a situation with authority like the police because "usually there is a long history of social rejection, lack of having friends, and so you want to be accepted, you want to be liked, especially if it is a person in authority, that … might be someone that they would look up to."

Geiger further explained that a person with Asperger's may display a reaction that is not congruent with the situation they are responding to, for example, if a person is telling them about relationship problems, they might make a nonsequitur like, "Well, have you ever played cribbage?" In general, people with Asperger's have "abnormal social responses to social interactions." People with Asperger's want to appear to be "something more than they're actually functioning as" due to "chronically struggling" with low self-esteem and not having a lot of friends, which might have the appearance of boastfulness or wanting to look successful or something that other people would admire or want to engage with socially. A person with Asperger's may say they are wealthy when they are not and may say they are going to own a $1 million-dollar home when that will not happen. Appellant's "family forever" tattoos signify that family is a significant value for him. Someone with Asperger's might say they want someone to be dead as a manifestation of something he is not able to express emotionally. Geiger explained, "[A person with Asperger's is] not able to say, I'm so frustrated, I want this situation to go away. I'm so angry that I—you know, I'm upset. I want to change the situation, but I don't know how. They are not able to express that. And so they say it in a very concrete form," but they do not actually want the person dead.

Scott Fraser, a professor in psychiatry law and behavioral sciences at University of Southern California's medical school, testified he was hired by the defense to review and

evaluate the documents related to the case including police reports, videos, psychological examinations, and school records and "indicate … what aspects of science and research that might be pertinent." He had never spoken to or treated appellant. Fraser concluded that two major aspects were involved in this case: Neuropsychopharmacology, the effects of drugs both acute and chronic use and the "the acuity, mainly the keenness of our ability to perceive the accuracy or the legitimacy of the emotions that other people are displaying." Fraser testified that the various medications appellant had been prescribed throughout his life would have caused permanent deterioration of parts of his brain associated with emotional functioning. Fraser further testified that people, including law enforcement, are generally poor at determining others' emotions.

Inmate Shaun Schaaphok at the Stanislaus County Public Safety Center testified that, in jail, Valverde told him he was looking to kill appellant because appellant was messing around with his girlfriend, but he killed his parents instead. When Valverde was in appellant's parents' house, he took some money.

Inmate Timothy Fee at the Stanislaus County Public Safety Center testified that, in jail, Valverde claimed responsibility for the murder and that appellant had nothing to do with it. Valverde also said he would not admit his actions until he was given a better deal.

### Prosecution's Rebuttal

The prosecution offered rebuttal evidence to show that at some point both Schaaphok and Fee were housed near appellant.

## DISCUSSION

## I.      Admission of Appellant's August 17 Statements to Law Enforcement

### A.      Relevant Background

Appellant moved in limine to exclude statements made at the interview conducted by the police on August 17. The court conducted a hearing pursuant to Evidence Code section 402 to determine the admissibility of the statements.

11.

Detective Hicks testified that on August 9, he conducted a nine-hour long voluntary interview with appellant in an interview room at the police station where he and appellant discussed various subjects such as his parents, family, friends, anyone who had any possible motives to hurt his parents, and many facets of appellant's life.

Hicks subsequently learned of the evidence recovered from Valverde's residence, and on August 17, at around 2:00 or 3:00 a.m., Hicks went to the house where he knew appellant was staying and told him he needed to talk to him again. He asked appellant a couple of questions, and they arranged to meet later that evening after appellant went out to dinner with his family.

After the dinner, appellant went to the police department and texted Hicks upon his arrival. Hicks met with appellant outside the front public area of the building. They went into the building through the public entrance and then upstairs to investigative services. Hicks did not control appellant's movements as they went up the stairs such as by holding his arm, and appellant was not handcuffed. Hicks directed appellant to sit in the seat farthest from the door because that was where the camera faced. The door was open, and Hicks told appellant it was open so "he could leave at any time." Appellant gave no resistance in entering the building and showed no interest in leaving the interview. Appellant was not handcuffed or restrained in any way. Detective Dale Lingerfelt was present throughout the interview to assist Hicks.

The court viewed the audio/video recording and transcript of the interview. Hicks began the interview by telling appellant they were "just gonna get right to the point" and that appellant would not be permitted to "carry on like … last time about stuff that just really didn't amount to anything." Hicks then told appellant he appreciated appellant coming in voluntarily because it made Hicks's "day a little bit easier." Hicks went on to say, "having said that, realize that at any time you're free to go as well, alright" and informed appellant that was why the door was open.

12.

Hicks then told appellant he was "not gonna put up with lying anymore." Hicks questioned appellant about why Valverde would have his parents' things, and appellant asserted he did not know. Hicks asked appellant a few times whether appellant gave his parents' things to Valverde, which appellant denied. Hicks responded to appellant's denials by saying he knew "the truth." Hicks told appellant he wanted appellant to be "[o]ne hundred percent honest and truthful." Appellant told Hicks he had never seen the keys to his parents' house but recognized photos of their wallets. Hicks insisted appellant had seen the keys and proceeded to argue with appellant about whether he was lying, with Hicks telling appellant they were going to move on because he was lying and Hicks was not going to "buy it anymore."

Hicks told appellant he had spoken to Valverde and that Valverde "knows he's in trouble." Hicks went on to say, "When people are in trouble they have something to gain and they have something to lose, alright. Ya know, and, and you're in that same position." Hicks said Valverde told him how everything happened and that he had held on to appellant's parents' things because he was planning on attempting to get more money out of appellant. When appellant stated he was not planning to give Valverde any money, Hicks told appellant to stop talking and accused him of not being honest.

Hicks confronted appellant with the fact appellant had not previously told him about Valverde despite giving Hicks contact information for several of his friends. Appellant responded that Valverde "really isn't a friend" and that he did not hang out with him much. Hicks then told appellant "don't say anything" and that he knew appellant had had a phone conversation with Valverde the night of his parents' murder. Hicks went on to say, "If you think for a second, alright, that your air tight alibi, or just because you weren't there or you didn't do it means that you're not responsible that is wrong. That is wrong, wrong, wrong, wrong. The problem with your alibi [appellant], it's too good. It's way too good. It's not normal and it's very predictable. So let's take a right turn here real quick… I'm gonna give you an opportunity to tell me the truth."

13.

Hicks talked to appellant about the other witnesses he had spoken to and asked appellant about his comments that he wished his parents were dead. Appellant responded by saying a lot of people say that about their parents. Hicks then gave several options for why appellant's parents were killed: "Perhaps somebody did this based on you running your mouth in a bar in a crowd of people and they took it upon themselves and perhaps this person later on decides I'm gonna use this against him and exploit him out of a lot of money. Perhaps that's what happened. That could be one version, however, there could be another version ya know. Perhaps you just hated your parents"; "Perhaps you wanted them dead"; "Perhaps you didn't like them controlling your life"; and "Perhaps you didn't like your living conditions and, ah, you came up with this, planned it, found people to do it and you, ah, built your alibi, and, ah, however, there was a couple things that failed, along the way, which gets us to where we are today." Appellant denied all of Hicks's hypotheticals.

Hicks went on to tell appellant he (Hicks) could choose not to talk to appellant at all, but that appellant "owe[s] it to [his] sister." Hicks told appellant he had spoken to the insurance company and "[e]verything is on hold until I get some answers" and that appellant would therefore not be able to buy his $1.3 million house in Georgia. Appellant told Hicks his parents were trying to relocate him to Georgia and Hicks told him, "No, no, no don't. That's not gonna work with me, okay." Hicks told appellant he had a choice to be "honest and truthful" and that the only person appellant was "either gonna hurt the most or help the most" was his sister. Hicks told appellant that he was going to "test" appellant to see if he was "gonna be selfish, self centered" or "do the right thing and help your sister." He told appellant that people who were not even police officers had looked at the case and "know the truth."

Hicks again told appellant he knew the truth and that Valverde's story was "somewhat unbelievable, however, very believable if you don't tell your story or your side because he makes it sound like you are a monster. He makes it sound like, ah, you

14.

are this very evil person. He makes it sound like, um, he took these things so that he could ride the wave. He makes it sound like oh, yea, I kept em, and do you know where I found this at?"

Hicks went on to discuss the evidence found at Valverde's house and told appellant he tested the keys and learned they fit the locks at his parents' house. Appellant told Hicks he gave Valverde a box of bullets because his .22 does not fire. Hicks responded by saying, "You gave him more than that," which appellant denied. Hicks told appellant Valverde had been arrested for murder. Appellant explained that Valverde wanted to extort money from his family. Hicks asked appellant why he did not tell him this earlier, and appellant said it was because he was "remembering a lot now," at which point Lingerfelt yelled "Bullshit!" and repeated "Bullshit!" several times. Appellant continued to insist he was telling the truth, and Lingerfelt and Hicks continued to tell appellant he was lying. Hicks told appellant he knew "how much money you were supposed to pay [Valverde]." When appellant denied agreeing to give Valverde any money, Hicks continued to tell him he was lying. Hicks then told appellant he knew he gave $100 to Valverde, to which appellant responded that it was just money for groceries. Hicks told appellant to "[s]top, stop, stop, stop, stop, stop" and that the $100 was given to Valverde "till the rest of the money comes in."

Appellant continued to deny that he was lying and Hicks continued to repeatedly insist he was lying, saying appellant "made a very bad choice" and "had your parents killed by people." Appellant continued to deny involvement. Appellant told Hicks he did not know who killed his parents and Hicks insisted he did. When appellant mentioned to Hicks that he understood Hicks thought appellant had something to do with it, Hicks replied that he "kn[ew]" appellant had something to do with it. Hicks went on to say, "Let's talk about why you and [Valverde] wanted your parents dead." Hicks asked appellant how Valverde got the keys to appellant's parents' house, and when appellant replied that he did not know, Hicks stated, "I know how he g[ot] the keys."

15.

Hicks continued to tell appellant he gave Valverde the keys, and appellant continued to deny, and eventually Hicks said, "You're not gonna convince me of anything other because [Valverde] says you gave him the keys and the keys both fit the garage door and the front door …. If you think for a minute that anybody, anybody is gonna believe your story including your sister you're mistaken." Appellant continued to deny giving Valverde the keys, and Hicks continued to insist he did. Hicks told appellant he was "not buying it" and that he was not "buying" "this whole Asperger's thing … either." Hicks started calling appellant a "fake" with regard to many aspects of his life. Hicks told appellant he had told Traster he wished his parents were dead, and appellant told him he had not seen Traster for two months. Hicks asked appellant about the phone conversation with Valverde he had on the night his parents died and appellant said he was asking him what they were doing for the weekend.

Hicks then told appellant to "listen to me for a second" and proceeded to speak in a monologue fashion about the evidence he had against appellant, including "no less than seven crime stopper tips of people telling me … [appellant] killed his parents" and that he was calling appellant's alibi a "Scott Petterson [*sic*] alibi." When appellant tried to interject, which he did several times, Hicks never let him, telling him things like "I'm not asking for any answers" and "don't interrupt" and that Hicks wanted appellant to "sit here and be quiet." Hicks told appellant that his "side is based on facts that I can prove beyond a reasonable doubt to an ordinary person, okay."

Hicks then began to ask appellant more questions about his assertion that Valverde was trying to extort money from his family. Appellant stated it was about a month ago. Appellant confirmed he gave Valverde the box of bullets after Valverde made the threat to his family and that he "could see that was a bad idea." Appellant also told Hicks that he remained friends with Valverde after the threat and continued to have contact and phone calls with him. Hicks told appellant he was not "buying this" and was simply "making a record of [appellant's] bullshit." Lingerfelt called appellant's explanation a

16.

"[f]airytale." Appellant told Hicks he did not have anything to do with his parents' murder and Hicks began arguing with appellant and told him, "You had [Valverde] kill your parents." Lingerfelt then told appellant, "You murdered your parents," to which appellant responded that he loved his parents. Lingerfelt replied, "You loved em so much you murdered them. You had em murdered." Appellant continued to argue with both detectives, and stated he wanted to investigate his parents' murder himself but had not started yet.

Hicks then asked appellant to take a "lie detector test." Appellant responded, "not anytime soon," because he did not have time and had to get ready to go on a trip. Hicks told appellant it would only take 30 minutes and they "could do it right now," but appellant said he needed to get home. Lingerfelt then said he would call appellant's sister to see if she was ready to pick him up, and appellant said that Carter would be picking him up. The detectives told appellant that Carter was on a date with someone else earlier. Hicks said he had someone ready to administer the polygraph "because I anticipated … you were gonna sit here and lie, lie, lie, lie, lie so I have a guy sitting in another room right now willing to give you a polygraph," and again asked appellant to take the test, to which appellant responded, "Not tonight."

Appellant started talking about how he was upset that Carter was dating, and Hicks asked, "Aren't you more concerned about proving your innocence." Appellant and Hicks continued to argue about whether appellant killed his parents. Appellant continued to insist he was not going to take the test that night, and the detectives continued to ask him to do so. Appellant said he would take it the next day, to which Lingerfelt responded, "No, we're gonna do it right now." Appellant repeatedly asked for a cigarette, and the detectives told him no. Lingerfelt then told appellant, "You can't be away from us right now, do the test." Appellant asked, "So what I take the test and then I'm free to go," to which Lingerfelt responded, "Take the test and we'll see if you're telling the truth or not."

17.

Eventually appellant said he would rather have a lawyer present. Hicks asked appellant, "would you like me to read you your right[s] so you know what they are," to which appellant stated he knew the *Miranda* rights, he just would rather "have a lawyer present that way everybody involved, it's not like a hearsay thing." Hicks told appellant, "Well I have to read them to you." Then proceeded to advise appellant of his rights. Hicks then asked if appellant wanted to answer his questions, to which appellant responded, "Not without an attorney present." Appellant then asked Hicks, "what do I do?" to which Hicks responded he was going to go to jail for murder.

Appellant eventually did take the lie detector test after conversing with the operator of the test and continued to be interviewed for approximately two more hours.

Hicks testified he had formed the opinion that appellant was a suspect at the end of the interview and this opinion was not based on "a particular thing" and explained "from the day I started the investigation until the last time I met with [appellant] was an accumulation of facts and evidence that built up to the point where I felt that he was a suspect. Probably the final determination was the information about Felix Valverde and the evidence that we found at his house." Hicks further determined that appellant had "made omissions about his involvement" that amounted to a confession. Later, Hicks testified he called the administrator of the polygraph test, or voice stress analysis, about 30 or 40 minutes into the interview, which was the point appellant had been converted in his mind into to a suspect. Hicks testified, however, he did not decide he was going to take appellant into custody until the point where he read him his *Miranda* rights. According to Hicks, prior to that time, appellant would have been free to leave the room.

The court ruled that appellant's statement up until he stated he wanted an attorney present would be allowed into evidence because he was not in custody at the time of the questioning, but that the remainder would not be permitted as evidence of guilt as he had invoked his right to counsel and his question about what he was supposed to do was not a reinitiation of the interview.

18.

### B. Analysis

Appellant contends the court erred by admitting statements from the August 17 interview because they were taken in violation of *Miranda*. We agree.

To protect a suspect's Fifth Amendment right against self-incrimination, prior to a "custodial interrogation," *Miranda* requires that law enforcement advise a suspect of the right to remain silent, that any statement made can be used against him or her in a court of law, that the suspect has the right to the presence of an attorney, and that if he or she cannot afford an attorney, one will be appointed. (*Miranda*, *supra*, 384 U.S. at p. 444; *People v. McCurdy* (2014) 59 Cal.4th 1063, 1085–1086.) "A statement obtained in violation of a suspect's *Miranda* rights may not be admitted to establish guilt in a criminal case." (*People v. Jackson* (2016) 1 Cal.5th 269, 339.)

Respondent does not dispute that the interview was an "interrogation"; thus, the issue before us is whether the interrogation was "custodial" so as to require that appellant be advised of his *Miranda* rights.

We apply a mixed standard of review, in which we review for substantial evidence the trial court's factual findings regarding the circumstances of the interrogation but independently determine whether a reasonable person in appellant's position would have felt free to end the questioning and leave. (*People v. Moore* (2011) 51 Cal.4th 386, 394–395 (*Moore*).) "The facts surrounding an admission or confession are undisputed to the extent the interview is tape-recorded, making the issue subject to our independent review." (*People v. Linton* (2013) 56 Cal.4th 1146, 1177.)

It is well-settled that a setting is not "custodial" "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495; *California v. Beheler* (1983) 463 U.S. 1121, 1125 (*Beheler*).) The question is whether there is a " 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." (*Beheler*, at p. 1125.)

19.

When there has been no formal arrest, the inquiry is whether "under all of the objective circumstances, a reasonable person in the suspect's position would have felt free to terminate the interrogation." (*People v. Caro* (2019) 7 Cal.5th 463, 491 (*Caro*).) The inquiry does not depend "on the subjective views harbored by either the interrogating officers or the person being questioned." (*Stansbury v. California* (1994) 511 U.S. 318, 323.)

In making this determination, the location of the interrogation as well as whether the individual subject to the questioning is a suspect are relevant factors to consider. Other relevant factors are the duration of the interview, statements made during the interview, the presence or absence of physical restraints during the interview, whether the individual is permitted to leave at the end of the interview, and the nature and form of questioning. (*Howes v. Fields* (2012) 565 U.S. 499, 509; *Caro*, *supra*, 7 Cal.5th at pp. 491–492.)

California appellate courts have also referred to a more detailed set of factors as summarized by *People v. Aguilera* (1996) 51 Cal.App.4th 1151: "[1] whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; [2] whether the express purpose of the interview was to question the person as a witness or a suspect; [3] where the interview took place; [4] whether police informed the person that he or she was under arrest or in custody; [5] whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; [6] whether there were restrictions on the person's freedom of movement during the interview; [7] how long the interrogation lasted; [8] how many police officers participated; [9] whether they dominated and controlled the course of the interrogation; [10] whether they manifested a belief that the person was culpable and they had evidence to prove it; [11] whether the police were aggressive, confrontational, and/or accusatory; [12] whether the police used interrogation

techniques to pressure the suspect; and [13] whether the person was arrested at the end of the interrogation." (*Id.* at p. 1162; see, e.g., *People v. Potter* (2021) 66 Cal.App.5th 528, 539–540; *People v. Torres* (2018) 25 Cal.App.5th 162, 172–173; *In re I.F.* (2018) 20 Cal.App.5th 735, 759; *People v. Saldana* (2018) 19 Cal.App.5th 432, 455 (*Saldana*).)

Ultimately, the question is " 'whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.' " (*Caro*, *supra*, 7 Cal.5th at p. 491.) *Miranda*'s concern with custodial interrogation was the " 'inherently compelling pressures,' " specifically the "psychological pressures 'which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.' " (*Maryland v. Shatzer* (2010) 559 U.S. 98, 103.)

We conclude, in considering the totality of the circumstances, the interview was custodial. Several of the relevant factors weigh in favor of this finding. First, Hicks initiated the interview by going to appellant's house at 2:00 or 3:00 a.m. to question him about his parents' belongings found at Valverde's residence and requested he meet with Hicks later that day at the police station. As *Miranda* explained, according to police manuals, this "privacy" at the police station helps " 'deprive[] [the suspect] of every psychological advantage' " as opposed to his home where he " 'may be confident, indignant, or recalcitrant' " and be " 'more keenly aware of his rights and more reluctant to tell of his indiscretions or criminal behavior.' " (*Miranda*, *supra*, 384 U.S. at pp. 449–450.) The early morning visit compounded the pressure of a police-initiated interrogation as it occurred at a time when appellant was likely not alert and displayed to appellant the police could contact him whenever they wanted. Hicks could have called or texted appellant as he had previously done but made the decision not to, which added a degree of urgency and dominance to the circumstances of the request that may have reasonably contributed to appellant's decision to go to the station.

That appellant was being questioned as a suspect was express at the outset of the interrogation. Respondent contends "the ostensible purpose of the interview appears to have been to ask appellant about the property found at Valverde's residence." While this may have appeared to be the purpose of the interview based upon Hicks's representations to appellant when he went to his house early that morning, it became clear very early in the interview itself that Hicks believed appellant was involved in the murder. While Hicks's questioning was initially focused on how Valverde got appellant's parents' belongings, when appellant stated he did not know, Hicks repeatedly told appellant he was lying. Very shortly after this line of questioning, Hicks told appellant he did not "want excuses or answers right now" just before telling him his "alibi" was "too good" and if appellant thought that he was not responsible for his parents' murder, he was "wrong, wrong, wrong, wrong." Hicks then started listing possible reasons for why appellant might have killed his parents. Hicks made these statements within the first 10 minutes of the interview.

In addition, the nature of the questioning was exclusively accusatory, with Hicks never asking general or neutral questions. " '[A]ccusatory questioning is more likely to communicate to a reasonable person in the position of the suspect, that he is not free to leave' than would general and neutral investigative questions. Thus, on the issue of custody, courts consider highly significant whether the questioning was brief, polite, and courteous or lengthy, aggressive, confrontational, threatening, intimidating, and accusatory." (*People v. Aguilera*, *supra*, 51 Cal.App.4th at p. 1164.) Here, Hicks used many of the techniques which the court in *Miranda* discussed as contributing to a psychologically coercive environment, including "displaying an air of confidence in the suspect's guilt," positing the guilt of the suspect "as a fact," and directing comments "toward the reasons why the subject committed the act, rather than … whether he did it." (*Miranda*, *supra*, 384 U.S. at p. 450.) The *Miranda* court explained these tactics among others "are designed to put the subject in a psychological state where his story is but an

22.

elaboration of what the police purport to know already—that he is guilty. Explanations to the contrary are dismissed and discouraged." (*Ibid*.)

Hicks repeatedly manifested a belief appellant had committed the crimes. Hicks and Lingerfelt consistently rejected appellant's answers to their questions and accused him of lying over and over. In several instances, Hicks engaged in back and forth type of arguing similar to the following exchange which happened fairly early in the interview:

> "HICKS:                         You made a very bad choice young man.
>
> "[APPELLANT]:                I didn't do anything.
>
> "HICKS:                         Yea you did.
>
> "[APPELLANT]:                No I didn't.
>
> "HICKS:                         Yes you did.
>
> "[APPELLANT]:                No.
>
> "HICKS:                         You had your parents killed by people.
>
> "[APPELLANT]:                No I didn't.
>
> "HICKS:                         Yes you did.
>
> "[APPELLANT]:                I didn't have anybody killed by anybody."

At one point, Hicks told appellant he could prove his case beyond a reasonable doubt to a jury. (See *Saldana*, *supra*, 19 Cal.App.5th at p. 458 [" ' "The awareness of the person being questioned by an officer that … the police have ample cause to arrest him, may well lead him to conclude, as a reasonable person, that he is not free to leave, and that he has been significantly deprived of his freedom." ' "].) While Hicks did ask appellant to expound upon his statement that Valverde was trying to extort his family, the manner of this questioning was clearly intended not to gather information but to point out holes in appellant's statement.

The interview lasted one and a half hours with Hicks controlling the interview the majority of the time, and, at one point, laying out his case against appellant and repeatedly keeping appellant from interrupting him. Further contributing to the

23.

oppressive atmosphere were other techniques employed by Hicks, including offering several reasons for *why* appellant committed the murders, rather than asking questions about *whether* he had involvement; appealing to appellant's attachment to his sister, indicating that he could help her by talking and suggesting that insurance funds would not be released until he talked; suggesting that if he did not talk, Valverde's statement alone would make appellant look "evil"; and personally attacking appellant, calling him a "fake," and suggesting his Asperger's was fabricated.

Hicks's interrogation techniques worked to communicate to a reasonable person in appellant's position that the interrogation would not be over until he made statements congruent with Hicks's theory of the case, which he made very clear throughout the interview. (See *Saldana*, *supra*, 19 Cal.App.5th at p. 458 [based on techniques such as manifesting a belief the defendant was guilty and indicating all denials would fail, "a reasonable person in [the defendant's] position eventually would have realized that telling the 'truth' meant admitting the detective's information was correct—and that until this 'truth' came out, the person could not leave."].)

Finally, weighing in favor of the interrogation being custodial, appellant was not permitted to leave at the conclusion of the interview. (See *Oregon v. Mathiason*, *supra*, 429 U.S. at p. 495 [finding significant in concluding a noncustodial setting that the suspect was able to "leave the police station without hindrance"]; *Beheler*, *supra*, 463 U.S. at p. 1121 [same].) Rather, appellant was only read his *Miranda* rights after stating he wanted a lawyer present.

We acknowledge Hicks thanked appellant for coming in voluntarily and informed him he was free to leave at any time. However, "[c]ourts have concluded that, under the circumstances of the particular case, advising the suspect that he was not under arrest and was free to leave was insufficient to support a conclusion that he was not in custody for purposes of *Miranda*. (See, e.g., *U.S. v. Hashime* (4th. Cir. 2013) 734 F.3d 278, 284 [telling the individual being interrogated he is free to leave ' "is not 'talismanic' or

sufficient in and of itself to show a lack of custody" ']; *U.S. v. Cavazos* (5th Cir. 2012) 668 F.3d 190, 195 [] [same].)" (*Saldana*, *supra*, 19 Cal.App.5th at p. 458.)

We also acknowledge that appellant was not physically restrained. However, appellant was situated in the far corner of the interview room and would have needed to walk past both Hicks, who was sitting across the table, and Lingerfelt, who was seated by the door, in order to exit the room. The video recording shows both Hicks and Lingerfelt were armed during the interview. Weighing these considerations against the others we have detailed, the fact that appellant was not physically restrained or handcuffed does not render the interview noncustodial.

Respondent relies heavily on *Moore*. *Moore* is factually distinguishable. The defendant in *Moore*, a murder case, was interviewed in a station interview room and was not handcuffed or otherwise restrained, and the door was kept open. (*Moore*, *supra*, 51 Cal.4th at p. 398.) The defendant was told he was not under arrest and "was there only to make a statement because he was the last person known to have seen the victim." (*Ibid*.) The detective asked the defendant neutral and general questions about the incident, his drug use and past arrests, and personal life. (*Id*. at pp. 397–399.) Eventually the detective asked a series of questions "suggesting" the defendant might have been present at the time of the crime and knew what happened to the victim. (*Id*. at p. 399.) After the defendant denied this, the detective "seemed to back off, but soon began questioning [the] defendant about any weapon he might have had with him when he went to the [victim's] house." (*Ibid*.) The detective told the defendant the victim had been killed and " 'this is the time for you to be honest with me.' " (*Ibid*.)

In concluding the interview was not custodial, the *Moore* court focused on the facts that the defendant was told he was not under arrest, was free to leave, was not handcuffed or otherwise restrained, and while the interview was "fairly long" at one hour and 45 minutes, it was "not, as a whole, particularly intense or confrontational" and for a "substantial period," the police did not convey any suspicion of the defendant or

skepticism about his statements. (*Moore*, *supra*, 51 Cal.4th at p. 402.) The court noted that the police initially contacted the defendant as a witness and even when they "began to express some skepticism about [the] defendant's statements, they did not claim to know he was guilty or, until the point [the] investigator … expressly arrested him, to have evidence of his guilt." (*Id*. at p. 403.)

While, like the defendant in *Moore*, appellant was told he was free to leave at the outset of the interview and was not physically restrained, the nature of the questioning, as we have explained, was significantly different and more oppressive. Unlike the interrogation in *Moore*, Hicks expressed that appellant was a suspect and communicated disbelief in all of appellant's denials from the very beginning of the interview and continued to do so for one and a half hours. Any of appellant's statements that did not fit with Hicks's theory of the case were not met with mere skepticism but outright rejection. Further, Hicks communicated he had enough evidence to prove appellant's guilt before a jury.

We conclude based on all the relevant factors, particularly the nature of the questioning, a reasonable person in appellant's position would not have felt free to terminate the interview and leave, and therefore the first interview was custodial. Accordingly, appellant's statements were taken in violation of *Miranda* and were inadmissible to prove guilt.

We also conclude the admission of the statements was not harmless. "The erroneous admission of statements obtained in violation of the Fifth Amendment is reviewed under the *Chapman* standard (*Chapman v. California* (1967) 386 U.S. 18, 24)." (*People v. Henderson* (2020) 9 Cal.5th 1013, 1029.) The People bear the burden " 'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.] The standard is satisfied only if '[t]here is no reasonable possibility that the verdict would have been more favorable to [the] defendant had [the] statements not been admitted.' " (*Ibid.*)

Respondent cannot meet this burden. Appellant's defense was that Valverde committed the murders alone and he was not involved, and it would not have been unreasonable for the jury to consider this defense. While there was ample evidence presented that Valverde committed the murders, as well as evidence that appellant made statements about wishing his parents were dead and that he was coming into money, appellant presented evidence rebutting the prosecution's theory Valverde worked at appellant's behest and evidence from family members and experts offering innocent explanations for his incriminating statements. Statements appellant made during the August 17 interview, while not direct confessions to the crimes, undermined his defense and strengthened the link the prosecution needed to make between appellant and Valverde. During the interview, appellant claimed for the first time after several police encounters that Valverde was trying to extort money from his family but that he nonetheless remained friends with him. Appellant also admitted to giving Valverde money and bullets after the alleged threats against his family were made. During their deliberations, the jury requested "any references to '$100' in the court record," which was the amount of money appellant told Hicks he gave to Valverde after the murders, indicating they did consider appellant's statement in evaluating the evidence. While respondent claims the statements made during the interview were largely duplicative of other evidence admitted at trial, that is inaccurate, as we can find no other source of this information in the record. While the jury could have inferred that appellant had hired Valverde to kill his parents based on other circumstantial evidence presented at trial, we cannot say appellant's statements did not factor into their decision.

We note that under *Chapman*, it is not enough that " 'in a trial that occurred without the error, a guilty verdict would surely have been rendered.' " (*People v. Quartermain* (1997) 16 Cal.4th 600, 621.) We must instead ask " 'whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.' " (*Ibid*.)

27.

Here, we cannot answer that question affirmatively. The admission of appellant's statements was not harmless.

## II. Denial of Appellant's Request for Access to Valverde's Competency Report

### A. *Relevant Background*

Valverde was a codefendant but was separated from appellant's trial because he was found mentally incompetent to stand trial in July 2020.

On July 27, 2020, appellant's counsel requested Valverde's competency reports to the extent they contained "something that works to the benefit of [appellant]." The prosecutor indicated he did not think he had authority to release them. He further stated he saw "[Valverde's counsel's] second report" that morning but did not have a copy. He went on to say he thought "that would be something the Court would decide if it is relevant" and "it would come from the Court or else if I can get a copy of the one, since I'm the involved party and order me to release them to [appellant's counsel], that is fine too." The court responded, "All right. Keep that in mind."

On July 29, 2020, appellant's counsel again requested "any documents pursuant to Mr. Valverde's 1368 or 1369 procedure that by law the Court can release to me. I think there may be material in there that can go to towards the Defense with [appellant]." The court indicated it wanted to hear from Valverde's counsel in case they objected. The court went on to say, "I'm not questioning the fact that you may use it to some fashion. I don't disagree with you, but I don't know. But I don't think I should release it…. [¶] So I think out of an abundance of caution, I think it would be appropriate for that to be taken up with Mr. Valverde and his attorney present." The court further indicated the court's file contained a report filed June 16, 2020, dated June 2, 2020, from Dr. Brar.

On July 31, 2020, the court conducted a hearing regarding disclosure of Valverde's section 1368 report with Valverde and his counsel present. Valverde's counsel indicated that recently enacted section 1369.5 was "dispositive." The court indicated that because the defense had not "complied with [section] 1369.5 or with the

relevant Rule of Court 2.551," the request was "denied without prejudice to them filing an appropriate motion."

On August 4, 2020, appellant filed a "MOTION FOR THE RELEASE OF CONFIDENTIAL DOCUMENTS RE DEFENDANT FELIX VALVERDE PURSUANT TO PENAL CODE SECTION 1369.5 AND RULE OF COURT 2.551." The motion indicated appellant was requesting "the confidential and non-confidential documents in the court's file pertaining to the co-defendant FELIX VALVERDE, and relating to the report of the court-appointed doctor and including the doctor's report and evaluation under Section 1368 and 1369 of the Penal Code, along with the Court's finding and Order pursuant thereto and such related documents as the Court feels are appropriate and just." Appellant specifically referenced a written report submitted by Dr. Shabneet Brar on June 16, 2020, under section 1368 and/or 1369, which resulted in the court's finding that Valverde was incapable of assisting counsel and ordering the criminal proceedings suspended as to Valverde. Appellant indicated the contents of the report would "assist him in the defense of the charges made against him." Appellant contended his request was "both a matter of 'Brady' discovery, and a request by the 'public.' "

Valverde opposed appellant's request, claiming that appellant had not articulated a provision of law permitting disclosure of the report and that he was not among the class of persons permitted access to the report. Valverde further alleged the report was privileged.

At the hearing on appellant's motion on August 11, 2020, the defense presented the reporter's transcript from a hearing on February 20, 2020, wherein Valverde's counsel presented a report prepared by Dr. Karen Fromming at the direction of the defense for the court to consider in determining whether to suspend proceedings pursuant

to section 1368.[6] In response, based on counsel's representations and the report, the court ordered criminal proceedings suspended pursuant to section 1368 and appointed Dr. Trompetter[7] to meet with Valverde and prepare a report.

At the February 20, 2020 hearing, Valverde's counsel requested the court to seal Fromming's report "so that the co-defendant does not have access to it" and asked that the prosecutor "also keep it confidential from the co-defendant." The court asked what authority it had to do so, and Valverde's counsel responded, "Until Mr. Valverde puts his mental state in issue either at trial or at sentencing, all of this should be covered by attorney-client privilege, work-product privilege, attorney-patient privilege." The court asked Valverde's counsel to explain further. Counsel explained that "[u]nder general 1368 law, … the contents of the report remain confidential until and unless the defendant puts his mental state at issue either at trial or sentencing." Counsel went on to say, "The contents of the report would be significantly beneficial to the co-defendant's preparation of his case and damage our client, Mr. Valverde's, defense in the process. And for those reasons, it should be kept confidential from the co-defendant." She further indicated that in the event Valverde is restored so he can go to trial, they did not "want to give away trial procedures, facts, policies, whatever strategies we may have in order to guarantee Mr. Valverde his right to be a competent defendant being tried in a special circumstance case."

The court stated it had not read Fromming's entire report and had only read the conclusions. The court further indicated it would have accepted counsel's representations in suspending criminal proceedings and referring him to a doctor to perform an evaluation without regard to the report. The court stated it accordingly would be

---

**6** The Honorable Dawn Frenchie Reeves presided over the February 20, 2020 hearing.

**7** It appears, based on the record, Dr. Brar ultimately conducted the evaluation and prepared the report.

returning the report to Valverde's counsel and later consider the court-ordered report, once prepared, "in its entirety." The court then noted the prosecutor would be receiving the report directly from the defense, at which point the prosecutor stated, "No. Based on the conversation we just had, that creates problems for me. There's apparently evidentiary items in there that I will receive that I may be required to turn over absent an order from the Court that I not." The prosecutor further explained he would have to turn over the report to appellant "if there is information there that is applicable to him that could be exoneration towards him." The prosecutor stated he would either need the court to order him not to provide the report notwithstanding any potentially exculpatory information in it or not get it, to which the court responded, "I say you not get it at this time."

At the section 1369.5 hearing, defense counsel argued that Valverde's February 20, 2020 statements about the contents of Fromming's report being significantly beneficial to appellant raised an inference that there may be potentially exculpatory information in Brar's court-ordered competency report.[8] Defense counsel emphasized, "I don't want this 1368 report to be published to the world and inferences or allegations notwithstanding. What would probably be appropriate is for the Court to take a look at the 1368 report in camera and ascertain whether there is any information therein that is not about Mr. Valverde's mental state, is not about Mr. Valverde's medical condition, but rather it's something that would be exculpating or *Brady* material for [appellant]." Defense counsel indicated that if the court were to conduct an in camera hearing and find there was nothing that would be beneficial to appellant, that "ends the motion." Defense counsel reiterated "the other contents of the 1368 would not be relevant to [appellant].

---

**8** It was clarified that Fromming was an expert retained by Valverde, and appellant's counsel explained appellant was *not* seeking Fromming's report, only the section 1368 report prepared by Brar.

I'm only looking for exculpatory material, nothing else." He later noted that the defense was not seeking private medical information of Valverde.

The court asked defense counsel what was relevant to appellant's defense that had to do with Valverde's mental state at the time of the examination. Defense counsel further explained "it may not be his mental state, so much as what he said. I don't have the report, so it's not something like I can review it and argue about its admissibility. That may come later." Defense counsel went on to say, "I'm happy with the Court saying, I'll give it to you, [defense counsel], but you can't release it to anyone and you can't use it without further order of the Court." Defense counsel explained that "I'm hoping that the inference is that something Mr. Valverde had said, either within the confines of Dr. Fromming's report or Dr. Brar's report or both, will help [appellant] at his trial and show that he is not responsible for this." Defense counsel further stated, "this isn't a fishing expedition for his mental health status or whether he loved his parents or what he did with his dog. I don't care about any of that. I only care whether there is anything in there that is directly attributable to Mr. Valverde's statement which would be admissible in a trial, and there may not be such to [appellant's] benefit. [¶] The People are alleging Mr. Valverde did this. So it is possible, maybe likely, that Mr. Valverde said something which would be incriminating as to him but exonerating as to [appellant] at the same time. That's the gem I'm looking for. And I think [appellant] is entitled to it."

Valverde's counsel maintained that appellant had not articulated an adequate legal basis for access to the report and the report was "privileged." Valverde's counsel's position was that the court should not even do an in camera review of the report. The court asked Valverde's counsel, if the court were to do an in camera review and find something in the report that was beneficial to appellant, would appellant's right to that possible defense be overridden by Valverde's confidentiality as provided for in the statute. Valverde's counsel responded, "Absolutely. Absolutely. Because the statute and the statutory scheme and the cases that have flowed from the statutory scheme, all speak

32.

to what the precondition is that triggers the unsealing or the use of the report in proceedings.  Those are limited to where a defendant places his state of mind at issue and the other situations almost all of which concern the District Attorney's use at trial of these … reports."

The court took the matter under submission and delivered its ruling on August 14, 2020:

> "… Counsel … explained that [appellant] was entitled to the report because it was relevant to Valverde's credibility and to his motivation in allegedly committing the two homicides.
>
> "While Valverde is a codefendant, his proceedings are suspended at this time and most likely will remain suspended while [appellant] proceeds to trial on August 24th.  Moreover, the People have filed their witness list and Valverde is not listed as a potential witness.
>
> "In light of his status as a codefendant, it seems highly unlikely that Valverde will be compelled to testify during [appellant's] trial.  While it is possible that statements allegedly made by Valverde could be offered during [appellant's] trial, at this point that is entirely speculative.  Parenthetically, the Court notes that because it is [appellant's] motion, he bears the burden of proof in this matter.
>
> "In essence, [appellant] argues that he has a due process right to the Brar report.  It is correct that in certain criminal cases the courts have created a due process exception to the psychotherapist-patient privilege for criminal defendants where the records contain evidence of disorders especially probative of the ability of an important Prosecution witness to comprehend and accurately relate the subject of his or her testimony.
>
> "The constitutional Confrontation Clause has been held to prevail over a statutory privilege, such as in *People versus Reber, R-E-B-E-R, 177 Cal.App.3d 523 at 530*, which has been disproved by *Hammon*.  The Defense in this instance is then entitled to use these records to impeach the patient; *People versus Caplan, 193 Cal.App.3d 543 at 558*.
>
> "Both *Reber* and *Caplan* were disproved by *Hammon*, which is *15 Cal.4th 1117*.  *Hammon* limited *Reber* and held that the Defense has no right to obtain pretrial discovery of privileged information in the hands of third party providers.  *Hammon* did not address the question of obtaining

33.

such documents pretrial from the possession of a government agency or from the court.

"Importantly, the right to disclosure is discussed in *Reber* and narrowed by *Hammon* applies to the records of Prosecution witnesses. Salient hereto, *Hammon* does not allow for pretrial discovery of privileged information and that the discovery is limited to Prosecution witnesses.

"Applying those principles to the case at bar suggests, if not compels, the denial of [appellant's] motion. If during the course of the trial Valverde's statements are presented as admissible evidence, only then would [appellant] have the right to request release of Dr. Brar's report, which is clearly confidential pursuant to Penal Code §1369.5.

"Additional support for this ruling can be found in *Nielsen, N-I-E-L-S-E-N, v Superior, 55 Cal.App.4th 1150.* Therein it was held that a defendant is not able to obtain the psychological records of a codefendant who it was believed would at some future date enter into a deal with the Prosecution to testify.

"Accordingly, [appellant's] motion for an order that this Court provide [appellant] with a copy of Dr. Brar's report is denied without prejudice. In the event [appellant's] right to the report ripens, he is certainly entitled to renew his motion.

"Presently, until evidence of Valverde's statements are received in evidence during the course of the trial, Valverde's right of confidentiality must prevail over [appellant's] due process rights."

### B.     *Analysis*

Appellant contends the court erred by declining to conduct an in camera review of the contents of Valverde's court-ordered competency report in order to see if they contained discoverable exculpatory evidence. We agree.

We review issues of statutory construction de novo. (*People v. Gonzales* (2018) 6 Cal.5th 44, 49.) Our goal is to determine the legislative intent of the statute. "Because the statutory language is generally the most reliable indicator of that intent, we look first at the words themselves, giving them their usual and ordinary meaning." (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1040.) When the statutory language is

34.

unambiguous, its plain meaning controls.  We also "generally must 'accord[] significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose,' and [the California Supreme Court] ha[s] warned that '[a] construction making some words surplusage is to be avoided.' " (*People v. Valencia* (2017) 3 Cal.5th 347, 357.)  " ' " 'The words must be construed in context in light of the nature and obvious purpose of the statute where they appear….' [Citation.]  The statute 'must be given a reasonable and commonsense interpretation consistent with the apparent purpose and intention of the Legislature, practical rather than technical in nature, and which, when applied, will result in wise policy rather than mischief or absurdity.' " ' " (*Harris v. Appellate Division of Superior Court* (2017) 14 Cal.App.5th 142, 148.)  Where the language supports more than one reasonable construction, we may look to extrinsic aids, including the legislative history, for additional guidance.  (*People v. Ruiz* (2018) 4 Cal.5th 1100, 1105–1106.)  We apply these traditional rules of statutory interpretation in interpreting the language of the California Rules of Court.  (*Harris v. Appellate Division of Superior Court*, at p. 148.)

Under the California Constitution, the public has a right of access to the meetings of public bodies or the writings of public officials and agencies.  (Cal. Const, art. I, § 3.)  In addition, there is a common law public right of access to records from judicial proceedings.  (*KNSD Channels 7/39 v. Superior Court* (1998) 63 Cal.App.4th 1200, 1203.)  It " 'serves the important functions of ensuring the integrity of judicial proceedings in particular and of the law enforcement process more generally' " (*Ibid.*)  It is "not absolute, but 'must be reconciled with legitimate countervailing public or private interests ….' [Citation].  However, the fundamental nature of the right gives rise to a 'presumption' in favor of public access." (*Ibid.*)

Senate Bill No. 557 (2019-2020 Reg. Sess.; Senate Bill 557) added section 1369.5, effective January 2020, which made documents submitted to the court regarding a criminal defendant's competency to stand trial presumptively confidential.  The

Legislature stated the following justification for the limitation of the public's constitutional right of access to the reports: "In order to protect the privacy of defendants with respect to personal information contained within expert reports and other documents that are prepared as part of mental competency hearings, it is necessary that those documents be presumptively confidential, except as otherwise provided by law." (Stats. 2020, ch. 251, § 2.)

Section 1369.5 provides, as relevant here, that "[a] document submitted to a court [pertaining to an inquiry into a defendant's competence], including, but not limited to, Sections 1369, 1370, 1370.01, 1370.1, and 1372, is presumptively confidential, except as otherwise provided by law." (§ 1369.5, subd. (a).) The statute mandates such a document "be retained in the confidential portion of the court's file" and "[c]ounsel for the defendant and the prosecution shall maintain the documents as confidential." (§ 1369.5, subd. (b).) The statute further provides: "The defendant, counsel for the defendant, and the prosecution may inspect, copy, or utilize the documents, and any information contained in the documents, without an order from the court for purposes related to the defense, prosecution, treatment, and safety of the defendant, and for the safety of the public." (§ 1369.5, subd. (c)(1).)

Section 1369.5, subdivision (c)(2) provides that "[a] motion, application, or petition to access the documents shall be decided in accordance with subdivision (h) of Rule 2.551 of the California Rules of Court." (§ 1369.5, subd. (c)(2).) California Rules of Court,[9] rule 2.551(h), is generally applicable to documents sealed by court order, rather than documents made confidential by statute, and provides, in pertinent part, that "[a] party or member of the public may move, apply, or petition, or the court on its own motion may move, to unseal a record." (Rule 2.551(h)(2).) A court may decide to unseal the record "entirely or in part" or "only as to certain persons." (Rule 2.551(h)(5).)

---

[9]     Further rule references are to the California Rules of Court.

36.

Rule 2.551(h)(4) provides: "In determining whether to unseal a record, the court must consider the matters addressed in rule 2.550(c)-(e)." Rule 2.550(c) provides that court records are presumed to be open unless confidentiality is required by law. In order to *seal* a record, according to rule 2.550(d), the court must expressly find facts that establish: "(1) There exists an overriding interest that overcomes the right of public access to the record; [¶] (2) The overriding interest supports sealing the record; [¶] (3) A substantial probability exists that the overriding interest will be prejudiced if the record is not sealed; [¶] (4) The proposed sealing is narrowly tailored; and [¶] (5) No less restrictive means exist to achieve the overriding interest." (Rule 2.550(d).) Finally, rule 2.550(e) sets forth that the court must specifically state the facts supporting the findings and direct sealing of only those documents and pages or portions thereof, if practical, containing the material needing to be sealed.

The author of Senate Bill 557 stated the following about the bill:[10]

"If a person is charged with a crime and is suspected of being incompetent to stand trial, written reports prepared by psychiatrists or psychologists are submitted to the court. These reports detail extremely sensitive medical and mental health information about the person, including information about the person's mental health history, current functioning, symptoms of mental illness, current and prior medications, and mental health diagnosis. This confidential information is currently open to the public, since it is contained in a criminal file, which is not confidential. If the court finds the person incompetent to stand trial, many additional records are required to be submitted to the court as part of the treatment process, and those too contain confidential information.

"Under current law, certain court records are presumptively confidential, such as records in juvenile cases (Welfare and Institutions Code § 827), conservatorship cases (Welfare and Institutions Code § 5118 and 5328), records of the family conciliation court (Family Code § 1818(b), paternity

---

**10** Respondent has requested we take judicial notice of the Legislative Counsel's Digest to Senate Bill 557 and a Senate Floor Analysis of SB 557, dated August 14, 2019. Appellant does not object. Accordingly we grant respondent's motion. (See Evid. Code, §§ 452, 459.)

case files (Family Code § 7643(b)) in forma pauperis applications (Cal. Rules of Court, rules 3.54 and 8.26), search warrant affidavits sealed under *People v. Hobbs* (1994) 7 Cal.4th 948, and personal information of a witness or victim contained in a police, arrest, or investigative report (Penal Code § 964).

"Outside of court records, medical and mental health records are normally deemed confidential, under both federal law (the Health Insurance Portability and Accountability Act, or HIPAA) and state law (Civil Code § 56.10).

"SB 557 would make certain court records in criminal competency proceedings presumptively confidential. The records in a particular case could be made public if ordered by a judge. Any member of the public or press would be able to ask a judge to make this order. SB 557 preserves the defendants' privacy interests in protecting highly sensitive medical information, making this consistent with the treatment of medical records in other contexts." (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill 557, Aug. 24, 2019.)

Here, the court denied appellant's request for access to Valverde's competency report without conducting an in camera review of the document. This was error. First, the trial court's failure to do such a review was based on misplaced legal authority. The two cases the court relied on in denying appellant's request, *People v. Hammon* (1997) 15 Cal.4th 1117 and *Nielsen v. Superior Court* (1997) 55 Cal.App.4th 1150, dealt with a criminal defendant's entitlement to information protected by the psychotherapist-patient privilege for impeachment purposes. These cases were not applicable to the present case, however, because the document sought by appellant was not protected by the psychotherapist-patient privilege. The psychotherapist-patient privilege does not apply in a competency proceeding (Evid. Code, § 1025) or in any situation where the psychotherapist is appointed by order of a court to examine the patient except where the defense attorney requests an evaluation to provide the lawyer with information needed so that he or she may advise the defendant whether to enter or withdraw a plea based on insanity or to present a defense based on his or her mental or emotional condition (*id.*, § 1017). (Cf., *People v. Gurule* (2002) 28 Cal.4th 557, 593 [communications made by

38.

client to psychotherapist retained by defense as experts protected by psychotherapist-patient and attorney-client privilege].)[11]  Nor does section 1369.5, as Valverde's counsel appeared to suggest below, create any new legal privilege.[12]  Rather, it made a class of documents presumptively confidential subject to a court's own motion or a motion by any member of the public for an order otherwise.  The cases relied on by the trial court were further inapposite because appellant was seeking exculpatory evidence, not impeachment evidence and not information about Valverde's mental health.

Further, requiring appellant to make a threshold legal showing to justify an in camera review of the report was contrary to the statute.  Valverde's counsel suggested below that appellant was required to establish a constitutional right to access the report before the court could review it.  This position is belied by the plain language of the statute and the court rules it incorporates by reference.  The statute provides for no threshold requirement in order to justify an in camera review of the report.  Rather, we conclude the court was required by the relevant authority to review the report in camera to determine whether it should grant access to appellant.

Under section 1369.5 and rule 2.551, confidentiality of competency documents is not absolute; rather, the Legislature has determined that when any party or member of the public seeks access, the court should use the same procedure as determining whether to unseal a record sealed by court order.  According to that procedure, the court clearly has discretion to order access to the record, but in determining whether to do so, it "must" consider the factors set forth in rule 2.550.  (Rule 2.551.)  These factors require a balancing of the relevant interests of the individual or entity seeking the record to remain

---

[11]    We note that while the report Fromming prepared at the direction of the defense referred to at the February 20, 2020 hearing may have contained privileged information, appellant was expressly not seeking that report, only the report prepared by the court-ordered doctor for the purpose of the competency proceedings.

[12]    We note respondent, on appeal, does not allege the report was privileged or contained privileged information.

sealed and the interest of the public or of the individual or entity seeking access to the record, as well as an evaluation of whether the sealing order is narrowly tailored enough to protect the relevant privacy interests and whether there are less restrictive means available to do so.  (See rule 2.550(c).)  The court cannot make such considerations without reviewing the contents of the record.  (See *H.B. Fuller Co. v. Doe* (2007) 151 Cal.App.4th 879, 894 ["[A] reasoned decision about sealing or unsealing records cannot be made without identifying and weighing the competing interests and concerns. Such a process is impossible without (1) identifying the specific information claimed to be entitled to such treatment; (2) identifying the nature of the harm threatened by disclosure; and (3) identifying and accounting for countervailing considerations."].) Thus, since the court "must" consider the factors set forth in rule 2.550 when faced with a request for access to records under section 1369.5, we conclude the court "must" review the document or documents sought in order to rule on such a request.  This is not to say the court must grant appellant access to the report; rather, the reason for access set forth by the requestor—here for discovery of potentially exculpatory evidence—is relevant to the determination of whether he is ultimately granted access.  In addition, we do not mean to suggest in any way that the court erred by hearing from Valverde's counsel on the issue.  Valverde's position, like appellant's, is relevant to the balancing analysis the court must do when deciding whether to grant the requested access.

Because we conclude section 1369.5 and the rules it incorporates by reference do not require any threshold showing of good cause to justify an in camera review of the records, we reject respondent's arguments that appellant did not make such a showing. Despite asserting appellant had a "burden" of showing good cause to warrant an in camera review, respondent cites no legal authority to support this contention.  While respondent is correct that a requestor under section 1369.5 has the burden to overcome the presumption of confidentiality in order to gain access to a report made confidential by

the section, as we have explained, the court must consider the contents of the requested report in determining whether that burden has been met.[13]

As we are reversing the judgment and remanding for a new trial based on our conclusion regarding appellant's *Miranda* claim, our remedy is limited. If upon remand, appellant brings a new request for access to Valverde's competency report, we conclude section 1369.5 requires the court to review the report in camera to determine whether appellant should be granted access in accordance with the relevant court rules. We express no opinion on whether the court should disclose any information to appellant but respectfully advise the trial court to consider that appellant has raised a strong countervailing consideration to the presumptive confidentiality of the record intended to protect Valverde's private information. Notably, appellant was not seeking Valverde's sensitive medical information, which the statute was enacted to protect, and was not seeking to make any of the contents of the report open to the public. Rather, he was seeking statements made by Valverde which may have been exculpatory as to him.[14] The court should also consider that any incriminating statements made by Valverde could not be used against him in a trial. (See *People v. Pokovich* (2006) 39 Cal.4th 1240, 1244–1254.) We also express no opinion on whether, if the trial court grants disclosure of statements made by Valverde within the competency report, any such statements would be admissible in trial.

---

[13] Because it is not the issue before us, we take no position here as to whether a court may summarily deny a request to access a record under section 1369.5 where no reason for access is alleged.

[14] Appellant was arguably entitled to such evidence under *Brady*, as this was information to which the prosecution had legal access. (See *J.E. v. Superior Court* (2014) 223 Cal.App.4th 1329 [in camera review under Welf. & Inst. Code, § 827 was the proper mechanism to resolve a defense *Brady* disclosure request involving information in a juvenile file].)

41.

Because we conclude appellant was statutorily entitled to an in camera review of the report he sought to access, we need not address his claim that his due process rights were violated.

## III.    Improper Instruction on Natural and Probable Consequences Doctrine

The parties agree the court erred by instructing the jury on the natural and probable consequences doctrine and disagree only on the issue of whether the error constituted reversal.  We need not consider this contention as it has been rendered moot by our decision to reverse on other grounds.

## IV.    Independent Review of *Pitchess* Materials

Appellant requests we independently review the record of the trial court's in camera *Pitchess* proceedings to determine whether it erred and violated his due process rights in determining nothing was discoverable.  Respondent does not oppose this request.

Under *Pitchess*, a defendant may bring a motion for disclosure of certain relevant information in the personnel files of police officers by showing good cause for discovery and how it would support a defense to the charge against him.  (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1018–1019; §§ 832.7, 832.8; Evid. Code, §§ 1043–1045.)

When the court finds good cause and conducts an in camera review pursuant to *Pitchess*, the court must hold an in camera hearing, during which the custodian of records brings "all documents 'potentially relevant' to the defendant's motion."  (*People v. Mooc* (2001) 26 Cal.4th 1216, 1226.)  "Subject to statutory exceptions and limitations …, the trial court should then disclose to the defendant 'such information [that] is relevant to the subject matter involved in the pending litigation.' "  (*Ibid.*)

The court must make a record that will permit future appellate review.  (*People v. Mooc*, *supra*, 26 Cal.4th at pp. 1229–1230.)  The court may preserve the record by either copying the documents and placing them in a confidential file, preparing a sealed list of

the documents it reviewed, or "simply state for the record what documents it examined" and seal that transcript. (*Id*. at p. 1229.)

"A trial court's decision on the discoverability of material in police personnel files is reviewable under an abuse of discretion standard." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1220–1221.)

Here, Valverde, joined by appellant, moved for disclosure of prior complaints of misconduct against Hicks and two other officers. The trial court granted appellant's *Pitchess* motion as to Hicks with regard to "false report, dishonesty, or coercive interview techniques." An in camera hearing was conducted on November 13, 2015. The court delivered its ruling in open court on December 2, 2015, that no records of the nature sought were to be disclosed.

We have reviewed the confidential reporter's transcript of the in camera hearing conducted on November 13, 2015. We have also reviewed a confidential settled statement prepared by the trial court at this court's direction executed on May 17, 2021. In the settled statement, the trial court described one file presented to it and noted the court did not retain a copy of the file. The court explained it subsequently issued an order to the relevant custodian of records to provide the file produced at the November 13, 2015 in camera hearing and conducted an in camera proceeding on May 7, 2021, where the court was informed the file had been destroyed pursuant to Modesto Police Department records retention policy. The superior court was provided with documents related to the destruction of the file and forwarded those documents to this court.

We conclude the documents provided by the superior court comprise an adequate record for review. (See *People v. Jackson*, *supra*, 13 Cal.4th at p. 1221, fn. 10 [where records were destroyed and the appellant showed no bad faith, reviewing court could rely on the court's record of the proceedings to determine whether the trial court abused its discretion].) After reviewing the documents provided to us, we conclude the trial court did not abuse its discretion in declining to disclose any information to appellant.

43.

## V.    Cumulative Error

We need not address appellant's contention that the cumulative prejudicial effect of the alleged errors warrants reversal because we have found prejudicial error.

## **DISPOSITION**

The judgment is reversed and the matter is remanded for a new trial and proceedings consistent with the views expressed in this opinion.

DE SANTOS, J.

WE CONCUR:

HILL, P. J.

DETJEN, J.